UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at Chattanooga

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:11-cr-102 |
| | ) | Judge Collier/Carter |
| JACKIE MORRISON | ) | |

REPORT and RECOMMENDATION

I. Introduction

Defendant Jackie Morrison has moved to suppress evidence found in his truck on November 14, 2011, after police detained him on the highway [Doc. 39]. He also moves to suppress statements made after his detention and evidence seized from his residence following his detention on the ground that they are derivative of the allegedly illegal seizure and search of defendant's truck and on the ground that his waiver of *Miranda* rights and his consent to search his residence were not intelligently and voluntarily given. *Id.* Because I conclude the police had probable cause to believe defendant was transporting marijuana in his truck before they stopped and searched it and because I conclude defendant validly waived his *Miranda* rights and gave his consent to search his residence, I conclude all the evidence against Mr. Morrison obtained from his truck, from him, and from his residence were lawfully acquired. It is therefore RECOMMENDED that defendant's motion to suppress be DENIED.

II. Relevant Facts

The undersigned held an evidentiary hearing on defendant's motion to suppress on Friday, April 20, 2012. The government presented four witnesses: Marion County Detective Chad Johnson, Marion County Detective Matt Blansett, and Agents Chris Smith and Seth Isbel of the 12th Judicial Drug Task Force (Task Force). Det. Johnson has been employed with the Marion

County Sheriff's Department since 2005, and he has been assigned to the Task Force since 2007. Det. Blansett has been employed with the Marion County Sheriff's Department since 2002. Agent Smith has been employed by the Task Force for two years and Agent Isbel has been with the Task Force since October 2011. Agent Isbell also has 13 years of prior law enforcement experience and is a certified K-9 handler. The defendant did not present any witnesses.

Sometime in 2010, Det. Johnson held a proffer session with a confidential informant who had federal drug charges pending against him (hereinafter referred to as "CI1"). CI1 told Johnson about a man named "Jack" who lived on Whitwell Mountain and had made a lot of money selling marijuana. Later, in August 2010, Det. Blansett responded to a call about a home burglary on Whitwell Mountain at defendant Jack Morrison's residence. When Blansett arrived at the residence, he was met by one of Jack Morrison's family members. Defendant arrived later and told Blansett $48,000 had been stolen from a safe in his house. Morrison told Blansett he owned a small construction business, and he gave Det. Blansett his cell phone number. Morrison also told Blansett he thought he knew who had taken the money and he would call Blansett with some names, but Morrison never followed up with the names. Det. Blansett passed this information on to Det. Johnson who remembered the story about Jack on Whitwell Mountain who made a lot of money selling marijuana.

Det. Johnson obtained a subpoena for defendant's account from Verizon and learned that one month after defendant had given Blansett his cell phone number, defendant dropped that number and obtained a new cell number. Johnson obtained defendant's cell phone records from 2007 to August 2010 and turned these records over to an intelligence analyst with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). Based on these records, the ATF analyst was

able to determine that defendant, (or more specifically, defendant's cell phone), had traveled to Lancaster, Texas 14 times for one or two days on each trip. Texas is a known source state for drugs. Analysis of the phone records provided much more information as well such as:

- The defendant made 243 calls to phone numbers located in the Laredo, Texas area, all associated with co-defendant Julio Barbosa, Sr., including the residence of Julio Barbosa, Sr. Most of these calls were made during the time defendant was traveling to Texas. Johnson was able to obtain information that Julio Barbosa, Sr. has previous convictions for illegal drug distribution. Johnson also learned from Barbosa's criminal records that Barbosa was involved in a traffic stop in Irving, Texas in 2009 that led to his arrest. In that stop, police seized $3,000 or $4,000. Police suspected Barbosa had just been involved in a marijuana transaction because of the large amount of money found on him and the marijuana packaging found in the back of Barbosa's vehicle. A review of defendant's telephone records by Johnson showed defendant had been in that same area of Texas the day before the traffic stop.

- One of Mr. Barbosa's phone numbers was also being called by several men that are currently in federal prison on marijuana and cocaine trafficking charges. This information was obtained by Johnson using a software program called "Epic."

- The defendant made 76 calls to the home number of co-defendant Sammy Nance.

- The defendant made 795 calls to the cell phone number of co-defendant Sammy Nance.

- The defendant made over a thousand calls to the home number of co-defendant Ollie Frizzell.

3

- The defendant also made numerous calls to the cell phone number of another co-conspirator who has not yet been indicted. Many calls to this number were made around the same time defendant was traveling to and from Texas.

- Each trip to Texas began with a phone call to Nance. Defendant would then travel to Texas and call Barbosa. Upon his return to Tennessee, defendant would call Nance again. Each trip lasted about 36 hours.

Det. Johnson interviewed CI1 again on July 29, 2011. CI1 did not know what "Jack" looked like but stated Jack was dating Ollie Frizzell, a fact Johnson later confirmed through surveillance. CI1 later testified for the government at a trial which led to the conviction of a defendant.

During the course of his investigation, Det. Johnson also subpoenaed the defendant's financial records and discovered that defendant had in excess of a million dollars spread out in accounts across the region and that defendant had structured his deposits and withdrawals, many of which were in cash, so that he could avoid the federal reporting requirements. Any deposit of $10,000 or greater triggered a federal reporting requirement by the bank, and defendant made some deposits for $9,999.00. Most deposits were in whole numbers between $8,000 and $9,000. Johnson did not believe defendant's small construction company was capable of generating more than a million dollars in income and the structuring of the deposits was very suspicious.

Johnson also learned that on July 18, 2011, the defendant wired $11,000 from his account at First Volunteer Bank to the account of co-defendant Julio Barbosa, Sr. at the International Bank of Commerce in Laredo, Texas. On July 19, 2011, the International Bank of Commerce in Laredo, Texas, filed a report indicating that Barbosa withdrew $10,500 from his account.

4

Through the use of another subpoena, Det. Johnson obtained defendant's cell phone records from August 2010 to August 2011. These are records of the new cell phone defendant obtained after the burglary in August 2010. Det. Johnson gave those records to the ATF intelligence analyst who reviewed them and determined that between August 2010 and August 2011:

- Morrison made 222 calls to Nance.

- Morrison made 402 calls to Frizzell.

- Morrison made 173 calls to another unindicted, alleged co-conspirator.

- Morrison made 78 calls to Laredo, Texas.

- Morrison made five trips to Texas.

A majority of the calls to Nance and the unindicted, alleged co-conspirator were centered around defendant's trips to Texas. On October 6, 2011, agents interviewed another confidential informant (CI 2), who stated that he had gotten multiple ounce quantities of marijuana from Sammy Nance on several occasions, the last of which he bought in September 2011.

In October and November of 2011, law enforcement agents used CI2 to make three monitored and recorded controlled buys of marijuana from co-defendant Nance at his residence in Whitwell. During one of these buys, Nance mentioned that his marijuana source was scared "the feds are watching him" because when he (the source) returned from his last trip to Texas, his phone wasn't working properly. The source said he hoped he could sell marijuana long enough to pay off his house. Nance also said his source was older, had a lot of money, and had never been caught, a description which fit the defendant. In one of the recorded buys, Nance referred to the marijuana as fresh "Tex-Mex." In another of the buys, CI2 delivered money previously

5

fronted to him to co-defendant Nance for marijuana. The exchange was monitored and recorded. Based on all the information gathered during his investigation, Johnson believed Nance's source was Jack Morrison.

During surveillance of defendant's home, agents observed that although defendant did not receive a lot of visitors, those who did visit would drop by for only a few minutes and then leave. This activity was consistent with drug purchases. Det. Johnson also noticed that whenever defendant left for the night, he turned on his porch light, but, if he was home, he would turn it off.

On November 7, 2011, CI2 informed Det. Johnson that Nance had said his source was feeling more confident, that he had said he had taken care of his phone problem, and he (the source) was preparing to go to Texas to acquire more marijuana. On November 8, 2011, believing that defendant would be leaving for Texas soon to acquire more marijuana, agents intensified surveillance of defendant by placing a surveillance camera on a tree across the road from defendant's property. On or about November 11, 2011, a pin register on defendant's home phone indicated defendant had received some phone calls from Laredo, Texas. Based on all this information, Johnson believed defendant's departure to Laredo, Texas to pick up more marijuana was imminent.

On Sunday, November 13, 2011, camera surveillance of defendant's property showed a truck believed to be defendant's truck leave defendant's house at 4:15 a.m. The porch light was left on indicating defendant would be gone overnight. Det. Johnson contacted the ATF analyst who was able to determine that defendant's cell phone had been turned off at 4 a.m. that morning, information Johnson found significant because Johnson believed defendant may have

6

turned off the phone to keep police from tracking him since defendant was suspicious that police were watching him. Johnson then reviewed the information the ATF analyst had provided him about defendant's other trips to Texas to confirm that defendant usually had a 36 hour turn around on such trips. Johnson concluded that if defendant was traveling to Texas, as Johnson believed he was, then defendant would be returning to Tennessee around 4 pm on Monday. Defendant's motor vehicle registrations indicated defendant owned a maroon F250 pickup truck. The surveillance video from the night before showed a truck with clearance lights on the side mirrors consistent with a Ford F250 pickup truck. Johnson also had obtained the tag number for the truck.

Det. Johnson immediately called a meeting of law enforcement officers regarding an operation to stop the defendant's vehicle on defendant's return to Tennessee. Johnson gave a description of defendant's vehicle and the tag number to Det. Blansett, Agent Chris Smith, and Agent Seth Isbel and instructed them to attempt to establish probable cause for a traffic stop of the defendant's vehicle so that they would not blow their cover if defendant was not, in fact, bringing marijuana back from Texas when they stopped him. However, Johnson told the officers that he intended to stop defendant to see if he was carrying marijuana regardless of whether defendant committed a traffic violation.

A string of surveillance was set up on either side of the Tennessee/Alabama line on Highway 72, the route Johnson believed defendant would take when returning to his house from Texas. Agents spotted and began surveillance of defendant's vehicle in Alabama at about 5:30 pm on Monday afternoon. Det. Blansett testified that he, sitting in an unmarked vehicle, first observed defendant as he crossed over into South Pittsburg, Tennessee on Highway 72. As

7

expected, defendant was driving a maroon Ford F250 truck with the appropriate tag number. Blansett began following defendant and observed the right side of the truck swerve into the left, fast lane for approximately 25 yards. About half a mile later, in a construction zone, Blansett observed the defendant's right wheels swerve into the right side emergency lane for about 2 seconds. Blansett, who was in an unmarked vehicle, reported this swerving to the other officers. He was advised that one of the officers in a marked patrol car would stop the defendant in a safer, non-construction area for failure to maintain his lane.

Agent Chris Smith then sighted the truck, waited until it left the construction zone, and stopped it at Exit 155 on Highway 72. A front dash video camera was turned on when Smith activated his blue lights.[1] Agent Smith testified he thought defendant was going to take Exit 155 anyway since that was the exit he needed to take to get to his residence. As Agent Smith approached defendant's vehicle, he used his flashlight to look through the back window and saw on the back floorboard a large dufflebag partially covered by a blanket. Agent Smith approached the defendant and asked for and obtained his driver's license, insurance, and registration information. While Agent Isbell was running a records check on defendant, Agent Smith asked defendant for consent to search his vehicle. Defendant refused. About 2 minutes later, agents conducted a K-9 sniff with a certified drug dog. The dog alerted on defendant's vehicle. After searching for about two minutes, agents found 66 pounds of marijuana in the

---

[1] It is the undersigned's understanding that the dash camera records continuously but there is no audio until the blue lights are activated. Once the blue lights are activated, the audio is engaged and the camera retains one minute of video prior to the affirmative activation of the camera by the blue lights.

8

duffle bag, and the defendant was placed under arrest. From the time the defendant's vehicle was pulled over until the time the defendant was arrested took about fifteen minutes.

After the marijuana in the truck was found, Det. Johnson introduced himself to defendant and said he wanted to talk to him. Defendant said he felt sick, and Johnson allowed him to sit in the back seat of Johnson's vehicle. Johnson made sure defendant was physically alright and then transported him to the Marion County Justice Center where Det. Johnson and another officer, Agent Delany met with defendant. Det. Johnson advised defendant of his *Miranda* rights by reading them from a form aloud. Defendant then read the written waiver of rights form himself and signed it. He appeared to have no difficulty understanding it. Johnson and Delany witnessed the waiver of rights. Defendant stated he had made three (3) other trips in addition to this one to Texas to pick up marijuana. Upon hearing the weight of the marijuana load (66 pounds) he had, he said, "I wasn't supposed to get that much." He admitted wiring $22,000 into Barbosa's bank account during the preceding 6 months. At no time did he ask for a lawyer or indicate he wanted to stop talking. The interview lasted approximately 30 to 40 minutes. Johnson and Delany made no promises to defendant for his cooperation. They did tell him if he cooperated, that fact would be passed onto the prosecutor. The conversation was polite. No threats were made, and no guns were drawn.

Also during this 30 to 40 minute interview, defendant provided written consent to search his residence. Johnson read the consent form aloud to defendant who then read it himself and signed it. Defendant expressed no concern over signing the consent to search form. In fact, defendant appeared very cooperative. Agents searched his residence and recovered $9,340 in cash (approximately $400 of which was marked money from the controlled buys from

9

co-defendant Nance), $820 from his pickup truck, dynamite, blasting caps, two (2) loaded pistols, four (4) long guns, scales, drug ledgers reflecting sales of 15.5 pounds of marijuana to another buyer, and financial records pertaining to Morrison's construction business. Agents also found a note with Barbosa's name on it.

### III. Analysis

A.   *Law Enforcement Had Probable Cause to Stop and Search Defendant's Vehicle*

Using the so-called "vehicle exception," officers may conduct warrantless searches of vehicles if they have probable cause to believe the vehicle contains contraband. *Chambers v. Maroney*, 399 U.S. 42, 52 (1970); *Carroll v. United States*, 267 U.S. 132 (1925); *United States v. Haynes,* 301 F.3d 669, 677-78 (6th Cir. 2002);*United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998); *United States v. Pasquarille*, 20 F.3d 682, 690 (6th Cir. 1994). The vehicle exception applies even in non-exigent circumstances as long as the vehicle is mobile and officers have probable cause to believe it contains incriminating evidence. *Maryland v. Dyson*, 527 U.S. 465, 466-67 (1999); *see also Haynes*, 301 F.3d at 677 ("the ready mobility of a motor vehicle is, in and of itself, 'an exigency sufficient to excuse failure to obtain a search warrant once probable cause to conduct the search is clear.'") (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996). When police have probable cause to believe a vehicle contains evidence of a crime, they may search the entire vehicle and any containers inside it where the evidence could be found. *Arizona v. Gant*, 556 U.S. 332, 347 (2009); *United States v. Mans*, 999 F.2d 966, 969 (6th Cir. 1993).

The Sixth Circuit in *Haynes* defined probable cause:

> We define probable cause as 'reasonable grounds for belief, supported by less than *prima facie* proof but more than mere suspicion.' *United States v. Bennett,* 905 F.2d 931, 934 (6th Cir.1990). Probable cause exists when there is a " 'fair probability that contraband or evidence of a crime will be found in a particular place.' " [U.S. v.

10

> Wright, 16 F.3d 1429, 1437 (6th Cir.1994) ] ( *quoting Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983)). Determining whether probable cause existed at the time of the search is a ' "commonsense, practical question" to be judged from the "totality-of-the-circumstances." ' *Id.* ( *quoting Illinois v. Gates,* 462 U.S. 213, 230, 103 S.Ct. 2317, 2338, 76 L.Ed.2d 527 (1983)). In determining whether probable cause exists, we may not look to events that occurred after the search or to the subjective intent of the officers; instead, we look to the objective facts known to the officers at the time of the search. *See United States v. Ferguson,* 8 F.3d 385, 391–92 (6th Cir.1993)(en banc).

*Haynes*, 301 F.3d at 678 (quoting *Smith v. Thornburg*, 136 F.3d 1070, 1074 (6th Cir. 1998); *accord United States v. Redmond*, 2012 WL 1237787 *4 (6th Cir. April 13, 2012) (unpublished). The government bears the burden to justify a warrantless search. *Unite States v. Herndon*, 501 F.3d 683, 692 (6th Cir. 2007); *Haynes*, 301 F.3d at 677.

Probable cause may emanate from collective police knowledge. *See United States v. Perkins,* 994 F.2d 1184, 1189 (6th Cir.1993) (finding that probable cause existed as a matter of the collective knowledge of all the officers and agents investigating a case). *See also Thacker v. City of Columbus*, 328 F.3d 244, 256 (6th Cir. 2003) ("Probable cause may be established from the collective knowledge of the police rather than solely from the officer who actually made the arrest"); *Collins v. Nagle*, 892 F.2d 489, 495 (6th Cir. 1989)("Many circuits, including our own, have determined that probable cause may be established from the collective knowledge of the police rather than solely from the officer who actually made the arrest."); *accord, United States v. Calandrella*, 605 F.2d 236, 246 (6th Cir. 1979); *Willis v. Neal*, 2007 WL 2616918, *4 (6th Cir. Sept. 7, 2007); *Massey v. Hess,* 2007 WL 2725890 *8 (E.D.Tenn. Sept. 17, 2007) (Collier, J.). In this instance, under the collective knowledge doctrine, all Det. Johnson's knowledge about defendant gathered during the course of his investigation may be imputed to the other law enforcement officers working with Det. Johnson on November 14, 2011. *Nagle*, 892 F.2d at 495

11

("Since the knowledge of the mining investigators working together on the scene and in communication with each other is mutually imputed, we do not require that every arresting officer possess all the information that, when amassed, gives rise to probable cause."); *see also United States v. Woods*, 544 F.2d 242, 260 (6th Cir. 1976) ("when a group of agents in close communication with one another determines that it is proper to arrest an individual, the knowledge of the group that made the decision may be considered in determining probable cause, not just the knowledge of the individual officer who physically effected the arrest.")

The United States contends that the information officers held in this case was sufficient to provide not just reasonable suspicion to stop the defendant's truck, but also an independent basis of probable cause to justify a stop and search of the defendant's vehicle for contraband. The undersigned agrees. Law enforcement amassed a large amount of information, detailed in the fact section of this report and recommendation, through an impressive, old fashioned police investigation indicating defendant was driving to Texas to buy and transport marijuana to Tennessee for resale. Law enforcement also obtained sufficient evidence to have reasonable grounds to believe that, on November 13, 2011, defendant had left for Texas and would be returning to Tennessee the following Monday afternoon with a new supply of marijuana in his vehicle for sale. The information Det. Johnson had was derived from a variety of sources including two CI's who had proven to be reliable and a large amount of independent corroboration including police surveillance, telephone records and financial records. Probable cause does not require *certainty* that defendant would have marijuana in his vehicle when defendant was stopped on November 14, 2011; there needed only to be a *fair probability* that marijuana would be in defendant's truck. When considering all the circumstances known to Det. Johnson at the time the

12

stop and search took place, there was, undoubtedly, a fair probability that defendant would have marijuana in his truck. I conclude law enforcement had probable cause to stop and search defendant's truck on November 14, 2011, and, therefore, it is unnecessary to consider the government's other arguments concerning the legality of the stop and search.

    B.    *Defendant's Waiver of His Miranda Rights and Consent to Search His Residence Were Voluntarily and Intelligently Given.*

        *1. Waiver of Miranda Warnings*

The Fifth Amendment requires Miranda warnings be given where a person is subject to custodial interrogation. *Dickerson v. United States*, 530 U.S. 428 (2000); *Oregon v. Mathiason*, 429 U.S. 492, 494 (1977). Defendant was given his *Miranda* warnings before his interview at the Marion County Justice Center, and he signed the form indicating he was waiving his *Miranda* rights. "To be valid, waivers of Fifth Amendment rights must be 'voluntarily, knowingly and intelligently' made.") *United States v. Montgomery*, 621 U.S. F.3d 568, 573 (6th Cir. 2010) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)); *see also Missouri v. Seibert*, 542 U.S. 600, 608-09 (2004)( The Fifth Amendment requires that a statement or confession be voluntarily, knowingly, and intelligently given to be admitted into evidence); *accord Dickerson*, 530 U.S. at 433; *United States v. Montgomery*, 621 F.3d 568, 573 (6th Cir. 2010). The government bears the burden to prove by a preponderance of the evidence that the confession or statements were voluntarily, knowingly, and intelligently given. *Seibert*, 542 U.S. at 608 n. 1; *United States v. Ostranda*, 411 F.3d 684, 696 (6th Cir. 2005); *United States v. Wrice*, 954 F.2d 406, 410 (6th Cir. 1992).

Whether a confession was voluntarily given requires inquiry into "'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." *Dickerson*, 530

13

U.S. at 434 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 223 (1973)). In making this inquiry, the court must consider the totality of the circumstances, "both the characteristics of the accused and the details of the interrogation." *Dickerson*, 530 U.S. at 434 (internal citations omitted). "The determination depends upon a weighing of the circumstances of pressure against the power of resistance of the person confessing." *Dickerson*, 530 U.S. at 434 (brackets original) (internal citation omitted). "Coercive police activity is a necessary element for finding that a confession was involuntary." *Abela v. Martin*, 380 F.3d 915, 928 (6th Cir. 2004) (citing *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)). Promises of leniency and threats of prosecution may also be forms of coercion which overbear an accused's will and render a confession or statement involuntary. *United States v. Johnson*, 351 F.3d 254, 261 (6th Cir. 2003); *Wrice*, 954 F.2d at 411.

In the instant case, law enforcement was not coercive and made no promises of leniency in exchange for a statement. The atmosphere was calm and polite. The defendant, who is an adult and runs his own business, appeared to understand what was happening. He read and signed the waiver form himself. The interview was short, only 30 to 40 minutes long, and he never indicated he wanted it to stop. I conclude defendant knowingly and voluntarily waived his *Miranda* rights when he gave his statements to law enforcement at the Marion County Justice Center on November 14, 2011.

### 2. Consent to Search

In *Schneckloth v. Bustamante*, 412 U.S. 218 (1973), the Supreme Court stated that whether a consent to search was "voluntary" or resulted from coercion or duress "is a question of fact to be determined from the totality of all the circumstances." *Id.* at 227. For consent to be voluntary, it must be unequivocal, specific, intelligently given, and free from duress or coercion. *United*

*States v. Erwin,* 155 F.3d 818, 823 (6th Cir. 1998)(citing *United States v. Scott*, 578 F.2d 1186, 1188-89 (6th Cir. 1978)). "It is the Government's burden, by a preponderance of the evidence, to show through clear and positive testimony that valid consent was obtained." *Haynes*, 301 F.3d at 680 (internal citation omitted).

A defendant does not need to know that he has the right to refuse consent for his consent to be valid. *Bustamonte*, 412 U.S. at 227. Additionally, detainees need not be advised that they are free to go for their consent to be valid. *Ohio v. Robinette*, 519 U.S. 33, 39 (1996). Rather, the court must analyze the voluntariness of a consent to search by a totality of the circumstances. *United States v. Mendenhall*, 446 U.S. 544 (1980); *United States v. Abdullah* 162 F.3d 897, 902 (6th Cir. 1998).

In *United States v. Crowder*, 62 F.3d 782 (6th Cir. 1995), the court listed a number of factors for courts to consider in determining whether a consent to search was given voluntarily, including: minimal schooling; low intelligence; lack of effective warnings to the defendant of his rights; the accused's knowledge of his right to refuse to consent; absence of any overt act or threat of force against the defendant; absence of any promises to the defendant or any indication of more subtle forms of coercion that might flaw his judgment; the defendant's giving his post-arrest consent on a public street and not in the confines of a police station; the absence of any indication that the defendant was a newcomer to the law, mentally deficient, or unable in the face of custodial arrest to exercise free choice; and the defendant's receiving *Miranda* warnings and notifications that the results of the search could be used against him. *Crowder* at 787 (citations omitted).

The defendant is a 63 year old man who knew he had the ability to refuse consent because a short time earlier he *had* refused consent to a search of his vehicle, necessitating the production

15

of the drug dog. As previously indicated, there was no coercion, no threats, and no promises of leniency. Defendant is a person who has the mental capacity to run a small construction business. He had been given his *Miranda* rights both orally and in writing before he was asked to give consent to search. He was also given a consent to search form which he read, appeared to understand, and signed. During the search of his residence, he was cooperative and did not ask for the search to stop at any time. I conclude his consent was voluntary, unequivocal, specific and intelligently given.

### IV. Conclusion

For the reasons stated herein, it is RECOMMENDED[2] that defendant's motion to suppress be DENIED.

S/*William B. Mitchell Carter*
UNITED STATES MAGISTRATE JUDGE

---

[2] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S.Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).