UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 1:11-CR-102 |
| v. ) | Chief Judge Curtis L. Collier |
| ) | |
| JACKIE MORRISON ) | |

**MEMORANDUM & ORDER**

Jackie Morrison ("Defendant") moved to suppress evidence found in his truck at the time of his arrest on November 14, 2011, statements made after his arrest, and evidence seized from his residence after the arrest (Court File No. 39). On May 30, 2012, Magistrate Judge William B. Mitchell Carter filed a report and recommendation ("R&R") recommending Defendant's motion be denied (Court File No. 79). Defendant then filed objections to the R&R (Court File 89) on June 14, 2012. For the reasons discussed below, the Court **ACCEPTS** and **ADOPTS** the R&R (Court File No. 79). Accordingly, Defendant's motion to suppress is **DENIED** (Court File No. 39).

**I.    BACKGROUND**

As the fact-finder, Magistrate Judge Carter's assessment of the facts is entitled to deference. *United States v. Irorere*, 69 F. App'x 231, 236 (6th Cir. 2003); *United States v. Hill*, 195 F.3d 258, 264-65 (6th Cir. 1999); *See United States v. Bradshaw*, 102 F.3d 204, 210 (6th Cir. 1996). Judge Carter found as follows:

Sometime in 2010, Detective Johnson of the Marion County spoke with a confidential

informant ("CI1"), who told him that a man named "Jack" from Whitewell Mountain, Tennessee was making large profits selling marijuana. In August of 2010, Defendant Jackie Morrison, who lives on Whitewell Mountain and owns a small construction business, reported $48,000 stolen from a safe in his house. CI1 also told Detective Johnson that he did not know the appearance of "Jack," but that he was dating Ollie Frizzell.

Detective Johnson placed Defendant's home on video surveillance and began acquiring personal and financial information on Defendant, including cell phone records and financial records. From the surveillance of Defendant's home, Detective Johnson came to believe Defendant was dating Ollie Frizzell. He also noticed that whenever Defendant left for the night, he turned the porch light on, but if Defendant was at home he left the porch light off.

From the phone records, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") analysts determined that Defendant's cell phone had traveled to Lancaster, Texas for 14 one or two-day trips. Analysts determined that Defendant had made numerous calls to co-defendant Sammy Nance, co-defendant Ollie Frizzell, and co-defendant Julio Barbosa. Each trip to Texas began with a phone call to co-defendant Nance, after which Defendant would travel to Texas and call Barbosa. Each trip lasted around 36 hours, and after his return to Tennessee, Defendant would again call co-defendant Nance.

Detective Johnson found that Co-defendant Barbosa had previous convictions for illegal drug distribution, and had been stopped in Texas under circumstances that led police to believe he was involved in marijuana sales (police seized $3,000 to $4,000, and found "marijuana packaging" in Barbosa's vehicle). Using Defendant's phone records, Detective Johnson found that defendant had been in the same area of Texas as Barbosa the day before this stop.

Detective Johnson also subpoenaed Defendant's financial records, and found over one

2

million dollars spread throughout his various accounts. Deposits of $10,000 or greater trigger a federal reporting requirement by the bank, and Defendant made multiple deposits for $9,999.00. Most of his deposits were in increments of either $8,000 or $9,000. Defendant also wired $11,000 to an account of co-Defendant Barbosa in Laredo, Texas.

In October 2011, agents interviewed another confidential informant ("CI2"), and in the following two months used him to make three monitored and recorded controlled buys of marijuana from co-defendant Nance. During these buys, Nance told CI2 that his source was older, had a lot of money, and had never been caught, a description that fit Defendant. Nance referred to the marijuana as "Tex-Mex," and told CI2 that because his source's phone was having problems he was suspicious of being watched by "the feds."

On November 7, 2011, CI2 informed Detective Johnson that Nance's source was preparing to go to Texas for more marijuana. On November 11, defendant received some phone calls from Laredo, Texas. On November 13, surveillance showed a truck leaving Defendant's house at 4:15 AM, leaving the porch light on. Based on the historical 36-hour turn around trips, Johnson believed that if Defendant had gone to Texas, he would be returning around 4:00 PM on the 14th. Detective Johnson called a meeting of law enforcement officers, and began surveillance around Highway 72, the expected return route of Defendant. On November 14th, around 5:30 PM, agents spotted defendant's vehicle enter South Pittsburg, Tennessee on Highway 72.

Marion Detective Matt Blansett began following Defendant in an unmarked vehicle, and observed the right side of the truck swerve into the left, fast lane for approximately 25 yards. About a half a mile later, in a construction zone, Blansett observed the defendant's right wheels swerve into the right side emergency lane for about two seconds. Blansett advised Agent Chris Smith of the 12th Judicial Drug Task Force. Smith, who saw the truck, waited for Defendant to

3

leave the construction zone, and stopped him.

Defendant did not give Agents consent to search his vehicle, but minutes after the stop they conducted a K-9 sniff with a certified drug dog. The dog alerted, the agents found 66 pounds of marijuana in the car, and Defendant was arrested. From the time Defendant's vehicle was pulled over to the time Defendant was arrested was about fifteen minutes.

Defendant was transported to Marion County Jail, where Detective Johnson advised him of his *Miranda* rights by reading them aloud from a form. Defendant then read the written waiver of rights form and signed it. Defendant was questioned for 30 to 40 minutes, during which he admitted that he had made three other trips to Texas to get marijuana.

After this interview, Defendant also gave written consent to search his residence. Again, Detective Johnson read the consent form aloud to Defendant, who then read it for himself and signed it. Agents searched Defendant's residence and recovered $9,340 in cash ($400 of which was marked money from controlled buys with co-defendant Nance), scales, drug ledgers, and financial records regarding Defendant's construction business.

## II.   DISCUSSION

### A. The Traffic Stop

Defendant's first objection is that law enforcement officers unlawfully stopped Defendant's vehicle.[1] Defendant himself, however, cites the proposition that "police may make an investigative stop of a vehicle when they have reasonable suspicion of an ongoing crime, whether it be a felony or misdemeanor." *Gaddis v. Redford*, 364 F.3d 763, 771 n.6 (6th Cir.

---

[1] Defendant contests that the two erratic movements do not establish reasonable suspicion for a traffic stop. Because there was a reasonable suspicion that Defendant was engaged in criminal activity, there is no need for a civil traffic violation, and the Court makes no ruling as to whether the two swerving incidents constitute a civil violation.

4

2004) (citations omitted). Defendant errs by applying the probable cause standard, where *Gaddis* clearly states that only a reasonable suspicion is required.

"A reasonable suspicion exists when, based on the totality of the circumstances, a police officer has a 'particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Baldwin*, 114 F. App'x 675, 679 (6th Cir. 2004) (quoting *United States v. Cortez,* 449 U.S. 411, 417-18 (1981)). In this analysis, "we must determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately." *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001).[2]

In this case, police had a reasonable suspicion that Defendant was engaged in criminal activity. CI1 described a man from Whitewell Mountain named "Jack" who was dating Ollie Frizzell. CI2 described the source of Nance as an older man with a lot of money, who had never been caught. Defendant's financial records show more money than Detective Johnson thought was likely from a small construction business, deposited in a suspicious manner. They also revealed transfers to Barbosa, a man with a criminal history for drug distribution. Defendant's phone records showed numerous short-term trips to Texas. On one of these, Defendant was shown to be in close proximity to Barbosa when he was found to have large amounts of cash and marijuana packaging.

---

[2] Defendant labors to prove probable cause was not met, and attempts to use comments made by Detective Johnson about not wanting to blow their cover (if Defendant did not in fact have marijuana when they stopped him). These efforts fail for at least three reasons. First, probable cause is not the proper standard, so Defendant's efforts to that end are misdirected. Second, extra caution by the police does not in and of itself indicate there was not a fair probability of finding evidence of a crime. Even with a high degree of certainty, a careful detective may choose to be cautions about risking his cover. Third, *Whren v. United States* makes clear "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." 517 U.S. 806, 813 (1996). Thus, whatever the police actually intended was irrelevant.

The above information gave law enforcement good reason to believe that Defendant was involved in the business of transporting marijuana from Texas. They had reasonable suspicion he was involved in doing so at this specific time for the following reasons: Defendant received calls from Texas, which often preceded his trips to Texas; Nance told CI2 that his source was preparing to return to Texas; and Defendant left his home at 4 in the morning, leaving his porch light on. Further, based on the previous trips to Texas, Detective Johnson predicted that if Defendant had gone to Texas, he would be returning on highway 72 around 4:00 PM on the 14th. Defendant was seen on route 72 within 90 minutes of that time, vindicating the belief that Defendant was returning from Texas.

Based on the above information, law enforcement had a reasonable suspicion that defendant was involved in transporting drugs from Texas to Tennessee, and that he was doing so on November 14th.[3]

### B. The Search

Law enforcement had probable cause to believe that Defendant's truck contained drugs because of the K-9 alert, and therefore their search of the vehicle was valid. "[W]here police have probable cause to believe that a vehicle contains contraband, they may search the entire vehicle and any containers located within it." *United States v. Mans*, 999 F.2d 966, 969 (6th Cir. 1993) (citations omitted). The Sixth Circuit defined "probable cause as reasonable grounds for belief, supported by less than *prima facie* proof but more than mere suspicion. Probable cause exists when there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Haynes*, 301 F.3d 669, 678 (6th Cir. 2002) (quoting *Smith v.*

---

[3] Defendant's objection "B – Questioning of the Defendant at the Traffic Stop" revolves around classifying the stop as a traffic stop. Since the stop is justified based on the reasonable suspicion of criminal activity, questions about where Defendant had been and who he had been with, were not unusually intrusive or coercive.

6

*Thornburg,* 136 F.3d 1070, 1074-75 (6th Cir. 1998)) (citations and internal quotations omitted).

"A positive indication by a properly trained dog is sufficient to establish probable cause for the presence of a controlled substance." *United States v. Diaz*, 25 F.3d 392, 393-94 (6th Cir. 1994) (citing *United States v. Knox,* 839 F.2d 285, 294 n.4 (6th Cir. 1988)).[4] In this case, a certified drug dog alerted on Defendant's truck, establishing probable cause.

Defendant objects, suggesting as an alternative explanation the dog alerted on the smell of diesel exhaust. Defendant bases this conclusion on the fact the dog alerted at the back of the truck, where no drugs were found, but where the exhaust source for the truck's diesel engine was located.[5] While it is true one cannot be *completely* certain of what dogs are smelling, Defendant has given no reason for why the dog would alert to diesel other than the conclusion "the canine was trained to react to different scents and smells." This allegation does not change the settled law that a trained drug dog alerting on a car provides probable cause for a search. Certainty is not required, so even if the Defendant were correct about what actually happened in this instance, it would not matter. A fair probability the vehicle contained contraband existed, and the officers legally searched defendant's truck.[6]

Accordingly, Defendant's contention any evidence flowing from the search of his automobile must be suppressed is without merit. Defendant claims the consent to search his

---

[4] Of course, as a panel for the United States Court of Appeals for the Sixth Circuit recently reaffirmed, a dog sniff for narcotics around the exterior of a car does not constitute a search under the Fourth Amendment. *United States v. Sharpe*, — F.3d —, No. 10-6127, slip op. at 1 (6th Cir. July 27, 2012).

[5] It is not clear whether the vehicle was running at the time of dog search.

[6] An alternative basis, relied on by Magistrate Judge Carter, for the search of Defendant's truck is the automobile exception. "Under the automobile exception to the warrant requirement, law enforcement officers may search a readily mobile vehicle without a warrant if they have probable cause to believe that the vehicle contains evidence of a crime." *United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998). Detective Johnson's investigation provided a fair probability that Defendant's vehicle contained evidence of a crime, so law enforcement needed no warrant to search it.

residence, and any statements made by him after the arrest were the poisonous fruit derived from an illegal stop or search, and should therefore be suppressed according to *United States v. Everett*, 601 F.3d 484, 487-88 (6th Cir. 2010). In *Everett*, a police officer stopped the defendant for speeding, but she began questioning him on other topics, from which she found that he had illegal contraband, and arrested him. The court stated "if the prolongation caused by her initial question violated the Fourth Amendment, all that followed was suppressible as 'fruit of the poisonous tree.'" *United States v. Everett*, 601 F.3d 484, 491 n.1 (6th Cir. 2010). In Defendant Morrison's case, the stop was based on reasonable suspicion of an ongoing crime and a trained narcotics canine provided probable cause to search the vehicle. Therefore the stop and search were permissible, and the resulting evidence does not need to be suppressed.

    **C. The Miranda Waiver and Consent to Search**

In his final objection, Defendant's argues even if the arrest were lawful, his waiver of *Miranda* rights and consent to search his residence were not voluntary. "To be valid, waivers of Fifth Amendment rights must be 'voluntary, knowingly, and intelligently' made." *United States v. Montgomery*, 621 U.S. F.3d 568, 573 (6th Cir. 2010) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). As Defendant points out, it is not enough for the government to simply state that it was voluntary; instead, "[t]he prosecution bears the burden of proving, at least by a preponderance of the evidence, the *Miranda* waiver, and the voluntariness of the confession." *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004) (citations omitted). In order to determine whether the government has met this burden, the court must make "an inquiry that examines 'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession. The due process test takes into consideration 'the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.'"

8

*Dickerson v. United States*, 530 U.S. 428, 434 (2000) (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, (1973)) (citations omitted).

Defendant asserts his waiver resulted from coercion or duress because he was in custody, surrounded by law enforcement officers, did not consult with family or counsel, and was a sixty-three year old who had never been incarcerated. If accepted, however, Defendant's arguments would lead to the conclusion that almost any request for a waiver would be coercive. Defendants will always be incarcerated and surrounded by law enforcement officials; youth or old age can equally be used to request special treatment.

Defendant suggests that law enforcement could have allowed him to contact his family or an attorney, but requiring police to do so before questioning a defendant would be a significant departure from Fifth Amendment jurisprudence. *See Moran v. Burbine*, 475 U.S. 412 (1986). In *Moran*, an Assistant Public Defender learned the defendant had been arrested, and told the police she would act as defendant's counsel if he were to be questioned. Police said he would not be questioned until the next day, but then began a series of interviews. Before beginning those interviewed, the police informed the defendant of his *Miranda* rights, which he waived. The defendant then confessed. The Supreme Court held that refusing to inform the defendant about his attorney's call and desire to represent him did not violate his Fifth Amendment rights, stating:

> No doubt the additional information would have been useful to [the defendant]; perhaps even it might have affected his decision to confess. But we have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights.

*Id*. at 422. The Fifth Amendment does not require officers to inform a defendant about an offer for counsel. Accordingly, the police's decision not to actively pursue counsel for this Defendant poses no Fifth Amendment problem here.

9

Additionally, the totality of the circumstances in this case demonstrates the police here did not extract an involuntary confession from Defendant. He is an intelligent man who runs his own business, and was sophisticated enough to refuse consent to search his vehicle. There is no direct evidence of coercion, and after denying consent to search his vehicle, Defendant never expressed further unwillingness or reluctance. He was interviewed for less than 45 minutes, and he both personally read the waiver, and had it read aloud to him. Based on the characteristics of the accused, and the details of the interrogation, the Court determines that the Government has met its burden by clear and convincing evidence, and that the Defendant's will was not overborne. The Court therefore denies this objection.

### III. CONCLUSION

For the reasons discussed above, the Court concludes law enforcement officials had reasonable suspicion that Defendant was engaged in criminal activity and stopped him legally. The Court concludes the canine free air sniff provided probable cause for searching the vehicle, and Defendant knowingly, voluntarily, and intelligently waived his *Miranda* rights. Accordingly, Defendant's objections are denied. The Court will **ACCEPTS** and **ADOPTS** the R&R (Court File No. 79). Defendant's Motion to Suppress is **DENIED** (Court File no. 39).

**SO ORDERED.**

**ENTER.**

/s/
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**